Filed 11/17/22  Bushansky v. Alliance Fiber Optic Products CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| STEPHEN BUSHANSKY, | H047100 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 16CV294245) |
| v. | |
| ALLIANCE FIBER OPTIC PRODUCTS, INC. et al., | |
| Defendants and Respondents; | |
| ERIC ALAN ISAACSON, | |
| Intervenor and Appellant. | |
| BAHMAN KHAKI, | H047101 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 16CV294833) |
| v. | |
| ALLIANCE FIBER OPTIC PRODUCTS, INC. et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Respondents; | NO CHANGE IN JUDGMENT |
| ERIC ALAN ISAACSON, | |
| Intervenor and Appellant. | |

BY THE COURT:

1

The opinion filed herein on October 19, 2022 shall be modified as follows:

1. The sentence commencing at the bottom of page 4 with "Four" and ending at the top of page 5 with "Alliance Stock" shall be modified. At the end of the modified sentence a footnote 2 shall be added. Subsequent footnotes shall be renumbered. As modified, the sentence, along with the footnote, shall read:

Four days after the public announcement, Chang sold all of the undisclosed Alliance stock from his wife's and brother's accounts.[2]

[2.] In the Schedule 14D-9, Alliance disclosed that Chang had 1,274,640 outstanding shares, as a result of which he would be due $23,580,840 if he were to tender all of his outstanding shares pursuant to the offer.

2. The first full sentence on page 5, commencing with "By selling" and ending with "windfall" is modified by replacing "his" with "the" so the sentence reads:

By selling the stock after the public announcement of the merger, he gained a substantial windfall.

3. On page 15, footnote 10, line 18, the parenthetical "(*Volcano*)" shall be added to the final citation after "749-750" so the citation reads:

(*In re Volcano Corporation Stockholder Litigation* (Del. Ch. 2016) 143 A.3d 727, 747, 749-750 (*Volcano*).)

4. On page 19, first full paragraph, line 6, the word "and" shall be added between "to the Securities and Exchange Commission," and "to the investing public" so the sentence reads:

Chang's insider trading was, of course, material to his fitness as a fiduciary, to his disclosure obligations to the Securities and Exchange Commission, and to the investing public with whom he surreptitiously traded his own shares to his personal profit, based on insider information.

5. On page 19, first full paragraph, line 12 the word "is" shall be changed to "was" so the sentence reads:

But Isaacson has identified no authority that would compel his conclusion that Chang's insider trading as Alliance sought to be acquired was material to shareholders deciding whether to accept Corning's share price.

6.  On page 24, the first sentence of the first full paragraph the words "Chang was subject to a derivative claim" shall be replaced with "Chang's insider trading subjected him to a derivative claim" so the sentence reads:

> In the trial court, Isaacson argued only that Chang's insider trading subjected him to a derivative claim for misuse of confidential corporate information by a fiduciary, and conceded that, because it was a derivative claim, it was "likely" extinguished by the merger.

7.  On page 25, line 20, the words "arising out of Chang's insider trading" shall be added immediately after "he identified no direct claims" so the sentence reads:

> In the trial court, Isaacson obliquely conceded that any derivative claims arising out of Chang's insider trading were "likely" released, and he identified no direct claims arising out of Chang's insider trading.

8.  On page 29, line 6, the word "vote" shall be changed to "tender" so the sentence reads:

> The final approval ruling does not rest on any express, necessary, or implicit ultimate determination that the shareholder tender was fully informed or that Chang's insider trading was immaterial to shareholders evaluating the tender offer.

9.  On page 29, first full paragraph, line 5, the word "vote" shall be changed to "tender" so the sentence reads:

> Reasoning that a shareholder tender is either "fully informed" or "uninformed," Isaacson asserts that the trial court decided that Chang's insider trading was not a material fact that needed to be disclosed to shareholders.

10.  On page 29, the last sentence of the first full paragraph the words "We reject the binary" are replaced with "In the settlement approval context, we reject the binary" so the sentence reads:

> In the settlement approval context, we reject the binary strictures of his premise and his interpretation of the trial court's fee award.

11.  At the end of the first full paragraph on page 29, after the sentence ending "court's fee award" add as footnote 18 the following footnote:

> [18] We acknowledge that, in the context of determining the substantive standard of scrutiny governing judicial review of a merger, a tender offer is either "fully informed" so as to trigger the protections of the business judgment rule, or it is

3

not.  (See, e.g., *Volcano*, *supra*, 143 A.3d at pp. 747, 749-750.)  But to transpose that binary structure to the settlement approval context is to require a disclosure settlement to be perfect.  Our refusal to do so does not limit the trial court's obligation to ensure that the settlement is fair, considering among other things the value provided by the disclosures that have been obtained and the value of the released claims.  We merely decline Isaacson's request to adopt a bright-line rule for which he has not cited supporting authority.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

4

Dated:                                        _____
                                              LIE, J.



_____
GREENWOOD, P.J.



_____
GROVER, J.







*Bushansky v. Alliance Fiber Optic Products*
H047100
*Khaki v. Alliance Fiber Optic Products*
H047101

Filed 10/19/22  Bushansky v. Alliance Fiber Optic Products CA6 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| STEPHEN BUSHANSKY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALLIANCE FIBER OPTIC PRODUCTS, INC. et al.,<br><br>Defendants and Respondents;<br><br>ERIC ALAN ISAACSON,<br><br>Intervenor and Appellant. | H047100<br>(Santa Clara County<br>Super. Ct. No. 16CV294245) |
| BAHMAN KHAKI,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALLIANCE FIBER OPTIC PRODUCTS, INC. et al.,<br><br>Defendants and Respondents;<br><br>ERIC ALAN ISAACSON,<br><br>Intervenor and Appellant. | H047101<br>(Santa Clara County<br>Super. Ct. No. 16CV294833) |

Intervenor Eric Alan Isaacson appeals from judgments entered in two shareholder class actions arising from Corning Incorporated's acquisition of Alliance Fiber Optic Products, Inc. Isaacson contends the trial court erroneously granted final approval of the negotiated settlement: in Isaacson's view, the court underestimated the materiality of insider trading by Alliance's chief executive officer—discovered only after the acquisition—both to Alliance shareholders deciding whether to accept Corning's tender offer and to the strength of shareholder claims released through the settlement. Finding no abuse of discretion, we affirm.

## I.   BACKGROUND

Alliance was a publicly traded Delaware corporation with its principal place of business in Sunnyvale, California. Alliance designed, manufactured and marketed a broad range of high-performance fiber optic components and integrated modules for the optical network equipment market. By at least mid-2015, Alliance's earnings were trending downward. By at least late 2014, Alliance had attracted interest as an acquisition target.

Four parties—Corning, Party A, Party B, and Party C— indicated interest in acquiring Alliance in late 2014 and early 2015. By May 2015, Parties A, B, and C had indicated to Alliance that they were no longer interested. Negotiations with Corning stalled in June 2015, with Corning's bid at around $21 per share and Alliance's counterproposal at around $22 per share, when Corning walked away based on its financial due diligence findings. Alliance made further overtures to Parties B and C, but in December 2015 and January 2016 was informed that each party, respectively, was not interested in a transaction. Corning, however, returned to negotiations with a valuation at between $17.25 and $18.50 per share. While negotiations resumed with Corning, Alliance's financial advisor secured a meeting with a new interested party, Party D. Alliance ultimately negotiated a deal with Corning, without meeting Party D.

2

Peter C. Chang was Alliance's president and chief executive officer and the chair of its board of directors. According to the allegations a criminal complaint filed in the Northern District of California on September 14, 2017, which we incorporate below, Chang engaged in insider trading and fraud in connection with a tender offer between October 2015 and April 2016.[1] During that time period, Chang controlled brokerage accounts held in the names of his wife and brother and used those accounts to trade Alliance stock based on material nonpublic information.

On September 30, 2015, the accounts held more than 183,000 shares of Alliance stock valued at more than $3 million. At that time, Chang had material information about Alliance's quarterly earnings that would not be made public until October 28, 2015. Between September 30, 2015, and October 28, 2015, Chang sold more than 150,000 shares of Alliance stock from the two accounts. On October 28, 2015, Alliance announced that its quarterly revenues were down 28 percent from the previous quarter. On October 29, 2015, Alliance's stock price decreased to $13.50 per share, 23 percent lower than the prior day's close. Chang avoided substantial losses by selling Alliance stock in advance of the earnings announcement.

On December 16, 2015, Chang received an offer from Corning to acquire Alliance in the range of $17.25 to $18.25 per share in cash. On January 11, 2016, Chang participated in an Alliance board meeting in which the Board agreed to enter an exclusivity agreement with Corning based on its revised indication of interest at $20.50 per share. On January 13, 2016, Chang signed an exclusivity agreement with Corning and participated in discussions with Corning about the due diligence process and

---

[1] On June 14, 2018, the federal court entered judgment against Chang pursuant to a guilty plea to three counts of securities fraud based on insider trading and one count of fraud in connection with a tender offer on the basis of a superseding information filed in the criminal proceedings. The superseding information was not presented to the trial court. Accordingly, we draw our summary of Chang's alleged illicit conduct from the original criminal complaint.

transaction timeline. Shortly after the events concerning the proposed transaction with Corning took place, Chang began purchasing tens of thousands of Alliance shares. By the end of January 2016, Chang held over 300,000 Alliance shares valued at more than $4.5 million in the brokerage accounts.

Alliance's year-end earnings announcement was scheduled for February 19, 2016. In the 10 days prior, Chang sold 129,000 Alliance shares for proceeds of over $1.9 million. After the close of market on February 18, 2016, Alliance released an earnings report that reflected a continued downward trend in revenues. On February 19, 2016, Alliance's stock price decreased to $12.03 per share, 16 percent lower than the prior day's close. Chang again avoided substantial losses by selling Alliance stock in advance of the earnings announcement.

After the earnings announcement, communications between Corning and Alliance about the possible transaction continued. Over the course of March 2016, the negotiations with Corning progressed to a transaction at $18.50 per share, based in part on Alliance's determination that it would be highly unlikely for another bidder to emerge with an equal or greater valuation. With at least one exception, Chang steadily increased his holdings of Alliance stock as the negotiations, in which he was involved, progressed. Chang did, however, sell 3,000 shares of Alliance stock while negotiations were suspended for Corning to review Alliance's financial results, at a time that coincided with a meeting between Alliance and Corning representatives to discuss Alliance's preliminary financial results for the first quarter of 2016. Ultimately, Chang held over 300,000 shares of Alliance stock by April 2016.

It was on April 7, 2016, that Corning and Alliance publicly announced that they had entered into a merger agreement. Pursuant to the agreement, on that day Corning commenced a tender offer to purchase all of the outstanding Alliance shares at a price of $18.50 per share in an all-cash transaction valued at approximately $305 million. Four

4

days after the public announcement, Chang sold all of his Alliance stock.  By selling his stock after the public announcement of the merger, he gained a substantial windfall.

On April 21, 2016, Corning filed with the Securities and Exchange Commission a Tender Offer Statement on Schedule TO and a Solicitation/Recommendation Statement on Schedule 14D-9 relating to the tender offer.  On April 22, 2016, Stephen Bushansky filed a shareholder class action challenging the merger in Santa Clara County Superior Court.  Three additional shareholder class actions followed, the last of which was filed by Bahman Khaki on May 6, 2016.

In Bushansky's operative First Amended Complaint, which was filed on April 29, 2016, Bushansky alleged that Alliance's directors negotiated an inadequate tender offer price.  Specifically, Bushansky alleged that Alliance's directors breached their fiduciary duties of care, loyalty, independence, candor, fair dealing, and good faith because, with a financial interest in securing a merger, they failed to take reasonable steps to ensure that stockholders received fair value for their shares and failed to provide shareholders with sufficient information about the tender offer to make an informed decision about the proposed transaction.  Bushansky's underlying theories included: (1) the directors failed to conduct a genuine auction or pre-signing market check, including by failing to meet with Party D; (2) the tender offer price failed to adequately compensate Alliance's stockholders for the benefits Corning would receive from the merger, as Corning was attempting "to capitalize on the rapidly growing data center and telecommunications industry[;]" (3) the merger was "timed in an effort to curb any future increase in the share price of Alliance common stock, thus ensuring that Corning can effectuate its takeover on the cheap[;]" (4) the directors agreed to unfair deal protection devices the decreased the possibility that any other bidder would top Corning's bid, including a no-solicitation provision, the extension of matching rights to Corning, a provision that required Alliance to pay Corning a termination fee if it decided to pursue a different offer, and a provision that precluded Alliance from waiving any material

5

provision of any confidentiality agreements; (5) the directors had a financial conflict of interest because it would allow them to liquidate their Alliance holdings and their stock options and restricted stock units would be paid out upon the consummation of the merger, meaning that the directors were interested in a deal at any price rather than securing a deal at the best price; and (6) the disclosures failed to disclose material facts, including among other things whether the confidentiality agreements between Alliance and Parties A, B, and C contained standstill provisions that prevented those companies from making a topping bid for the company.[2]  Bushansky alleged that Corning and a subsidiary aided and abetted the breach of fiduciary duties.  Khaki pled substantially similar claims.

Between May 4, 2016, and May 25, 2016, Defendants[3] produced to plaintiffs' counsel confidential and non-public documents relating to the proposed transaction. These included minutes from Alliance board meetings, presentations Alliance's financial

---

[2] A standstill agreement is a feature of some non-disclosure agreements entered prior to merger negotiations, which prevents the parties from negotiating during a determinate time-period.  (See *In re Appraisal of Columbia Pipeline Group, Inc.* (Del. Ch. Aug. 12, 2019) 2019 WL 3778370, *7 (*Columbia Pipeline*); see also *Apple Inc. v. Superior Court* (2017) 18 Cal.App.5th 222, 247, fn. 11 [although an unpublished California appellate opinion may not be cited or relied upon pursuant to California Rules of Court, rule 8.1115, citing unpublished opinions from other jurisdictions does not violate this rule].)  The intended benefit of a standstill provision is to motivate the potential bidder to make its highest and best offer before the standstill goes into effect— enabling the target company to conduct a prompt market check before signing a merger agreement—because there will be no subsequent opportunity for the potential bidder to increase its offer.  (*Columbia Pipeline*, *supra*, 2019 WL 3778370, at p. *36.)  But, because the potential buyer is precluded by the standstill agreement from increasing its bid, such a provision could limit the effectiveness of the market check the target company undertakes after signing a merger agreement and before closing.  (*Ibid*.)

[3] The defendants named by Bushansky and Khaki are Alliance, Chang, Gwong-Yih Lee, James C. Yeh, Richard B. Black, Ray Sun, Corning, and Apricot Merger Company.  Each of these defendants, save Apricot Merger Company, joined in Defendants' appellate brief.

6

advisor gave to Alliance's board, presentations made by Alliance's management, and financial projections prepared by Alliance's management.

On May 10, 2016, Plaintiffs initiated settlement negotiations by sending a demand letter to Defendants in an effort to resolve the actions through a settlement. On May 26, 2016, the parties reached a settlement agreement in principle, which they memorialized in a Memorandum of Understanding (MOU). Pursuant to the MOU, Alliance was required to waive a standstill agreement with Party B and make supplemental disclosures, including the existence of the standstill agreement and waiver thereof, through an amendment to the Schedule 14D-9 in exchange for a dismissal of the pending actions with prejudice and a release of claims. This means that Party B was permitted to make a confidential offer to acquire Alliance in the short period of time remaining before the tender offer closed, an option that would otherwise not have been available to it because of the standstill agreement,[4] and the shareholders were alerted to the pertinent negotiating dynamics, to the extent that informed their consideration of the tender offer. The MOU also provided for confirmatory discovery. In accordance with the MOU, Alliance filed with the SEC Amendment No. 5 to its Schedule 14D-9 the following day.

The deadline for Alliance's shareholders to decide whether to tender their shares was June 3, 2016. Corning's tender offer was successful. On June 6, 2016, Alliance became an indirect wholly owned subsidiary of Corning.

After completing confirmatory discovery, the parties executed a settlement agreement in August 2017. Pursuant to the settlement agreement, Alliance: (1) had made supplemental disclosures; (2) had waived a standstill provision in an agreement

---

[4] The confidentiality agreements Alliance entered with other parties did not have standstill agreements that remained in effect at the time of the settlement, so the other parties were not foreclosed from submitting confidential offers to acquire Alliance during the tender offer period.

with a specific third party; and (3) would be responsible for the costs of disseminating notice to the settlement class for the purposes of securing settlement. In exchange, Plaintiffs and the putative settlement class would be subject to a release of claims. Further, Plaintiffs agreed to cap their anticipated request for attorneys' fees and litigation expenses at $2 million. Defendants retained the right to oppose the fee request.

Plaintiffs filed their initial motion for preliminary approval of the proposed class action settlement on August 28, 2017. The trial court directed Plaintiffs to provide additional information bearing on the value of the consideration exchanged in the settlement, including the value of the supplemental disclosures, the value of the standstill waiver, and the potential value of the claims Plaintiffs were releasing, accounting for the risks presented by continued litigation.

After Plaintiffs and Alliance filed belated supplemental submissions, the trial court denied Plaintiffs' preliminary approval motion without prejudice. The court reasoned that: (1) a standstill waiver could have some value depending on the deal size, the likelihood of a topping bid, and the likely change in the value of the merger if a topping bid occurred, but the parties had failed to assess the relevant factors or otherwise provide contextual indicia that the standstill waiver generated value in this case; (2) disclosure of the standstill waiver could have some value, but the value could not be evaluated without the same contextual information regarding the value of the standstill waiver; (3) Plaintiffs had not shown that any of the remaining disclosures were valuable to shareholders; and (4) Plaintiffs needed to, but, in light of the foregoing, did not, demonstrate that the settlement "provided real value to shareholders" to "justify the broad release associated with the settlement."

Plaintiffs filed a renewed preliminary approval motion on November 13, 2018.[5] On December 7, 2018, the court directed supplemental briefing. Plaintiffs made a supplemental filing on January 8, 2019.

The trial court granted preliminary approval of the proposed settlement on January 29, 2019. First, the court reasoned that Plaintiffs had provided an analysis sufficient to "support the conclusion that the standstill waiver provided some value to shareholders." Plaintiffs provided information about the history of the discussions between Alliance and Party B and Party B's general area of business. While the court was concerned by a lack of information regarding whether Party B had conducted sufficient due diligence to enable it to make a topping bid in an eight-day window, the court noted that the record supported the proposition that Party B had engaged in serious negotiations with Alliance before walking away when Alliance's share prices increased in 2015. Because the tender offer was 15 percent below Alliance's 52-week high value,[6] the court reasoned that there was some "uncertain" likelihood that Party B would have submitted a topping bid at the time of the waiver, even accounting for the termination fee. Further, Plaintiffs "submitted a valuation . . . based on [a non-scientific] methodology used by Vice Chancellor Laster in [two Delaware cases,]" which the court found "helpful." The court found Plaintiffs' conclusion that there was a 4.6 percent likelihood of a topping bid as a result of the waiver to be "probably too high given that the standstill waiver here impacted a single party" but was satisfied that the analysis and citations

[5] Two other plaintiffs who joined the initial preliminary approval efforts dismissed their actions after the court denied preliminary approval.

[6] Bushansky alleged that $18.50 tender offer price reflected a "discount of nearly 14.9% to the Company's 52-week high of $22.35 per share on July 23, 2015." But, as noted above, the share price had dropped to $12.03 per share on February 19, 2016. Alliance's asking price came down along with its share price. Although negotiations stalled with Corning's bid at $21 per share in June 2015, Alliance accepted a bid from Corning at $18.50 per share in April 2016.

supported the conclusion that the standstill waiver provided "some value to shareholders."

Second, the court preliminarily concluded that disclosure of the standstill provided "material value" to shareholders. The court was preliminarily satisfied, in light of the "challenges to achieving a financial recovery . . . , which are described in plaintiffs' motion, and the impossibility of rewriting the history of the negotiations leading up to Corning's offer," that ensuring that the shareholder tender was "fully informed was probably the most important outcome this action could achieve," such that informing shareholders about the standstill provided material value under persuasive Delaware authorities.

Third, although the release was not "narrow," Plaintiffs conducted an adequate investigation to enable them to determine that "shareholders do not likely possess any meritorious claims connected to the transaction, other [than] those addressed by the settlement. Significantly, the fact that no additional lawsuits have been filed since this case was settled over two years ago bolsters this conclusion and distinguishes the circumstances here from those present in the typical disclosure settlement."

After notice was given to the class, Plaintiffs moved for final approval of the proposed settlement and for an award of $500,000 in fees and expenses.

Isaacson filed an objection to the final approval motion.[7] Isaacson argued that the settlement provided no substantial benefit to the class: (1) the standstill waiver was, "at best, a minor benefit[;]" and (2) because the standstill provision was waived, disclosure of the standstill provision provided no additional benefit to stockholders. Further, Isaacson asserted that Plaintiffs did not conduct an adequate investigation, such that they did not secure adequate assurance that the broad release would not extend to unintended,

---

[7] Isaacson and Defendants separately opposed the request for attorneys' fees and expenses.

10

and valuable, claims. In particular, Isaacson contended that Plaintiffs had failed to uncover claims related to Chang's insider trading, which Isaacson contended were apparently within the scope of the release.

Bushansky, Khaki, and Defendants replied to Isaacson's objection. Nevertheless, on the eve of the final approval hearing, Khaki withdrew his support for the settlement.

On the same day, Isaacson filed a motion to intervene. The express purpose for the motion was to preserve Isaacson's appellate rights.

Following the final approval hearing, the court entered a written order granting the final approval motion on May 2, 2019. As to Isaacson's arguments, the court explained that: (1) it remained persuaded that the standstill waiver and disclosure had material value, albeit less value than argued by Bushansky; and (2) it was not persuaded that Bushansky's investigation failed to uncover potentially viable claims related to the merger or that any such claims exist because (a) Isaacson appeared to agree that claims arising from Chang's insider trading were derivative claims extinguished by the merger; (b) Bushansky was unlikely to have been able to uncover claims of insider trading through a reasonable investigation when the settlement was negotiated given Chang's efforts to conceal his misconduct; and (c) there were no lawsuits filed relating to Chang's insider trading, and no opt outs from the settlement to preserve the right to pursue such claims, in the years following the revelation of Chang's misconduct.

The trial court awarded Bushansky $238,916.50 of his requested $500,000 in fees, with $1,000 of the reduced amount to be paid to Bushansky as an incentive award. In arriving at the fee award, the court fixed a reasonable lodestar and declined to apply any multiplier, explaining that the claims were straightforward and the litigation involved limited time and risk.

On May 2, 2019, the court entered judgment in both the Bushansky and Khaki actions pursuant to its order finally approving the settlement.

11

On June 14, 2019, the court granted Isaacson's motion to intervene "for the sole purpose of preserving Isaacson's standing to appeal."[8]  Isaacson timely appealed in both the Bushansky and Khaki actions.  This court ordered the appeals considered together for purposes of record preparation, briefing, oral argument, and disposition.

## II.     DISCUSSION

### A.     *Legal Principles and Standard of Review*

The requirement for court approval of a class action settlement (Cal. Rules of Court, rule 3.769) is intended for " ' "the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." [Citation.]' " (*Luckey v. Superior Court* (2014) 228 Cal.App.4th 81, 93.) Approval requires the court's determination that " ' "the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." ' [Citation.]" (*Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 820 (*Carter*).)

A settlement is subject to a rebuttable presumption of fairness " 'where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small.' [Citation.]" (*Carter*, *supra*, 224 Cal.App.4th at p. 820.)  Moreover, "[d]ue regard should be given to what is otherwise a private consensual agreement between the parties. . . . 'Ultimately, the [trial] court's determination is nothing more than "an amalgam of delicate balancing, gross approximations and rough justice." [Citation.]' [Citation.]" (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801 (*Dunk*).)

[8] We decline Respondents' invitation to dismiss Isaacson's appeal for lack of standing.  (*Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 267, 273 (*Hernandez*) [an unnamed class objector may challenge the judgment on appeal by intervening in the action or filing a motion to set aside the class judgment].)

12

But the trial court must nonetheless assess the proposed settlement on its substantive merits, particularly where class certification has been deferred to the settlement stage.  (*Carter*, *supra*, 224 Cal.App.4th at p. 820.)  " ' "The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." ' "  (*Kullar v. Foot Locker Retail, Inc*. (2008) 168 Cal.App.4th 116, 130 (*Kullar*).)  Relevant considerations include " '[1] the strength of plaintiffs' case, [2] the risk, expense, complexity and likely duration of further litigation, [3] the risk of maintaining class action status through trial, [4] the amount offered in settlement, [5] the extent of discovery completed and the stage of the proceedings, [6] the experience and views of counsel, . . . and [7] the reaction of the class members to the proposed settlement.' "  (*7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1146 (*7-Eleven*).)  The trial court, however, does not " ' "try out or attempt to decide the merits of the controversy." ' "  (*Ibid.*)  It is sufficient that the settlement be "within the 'ballpark' of reasonableness."  (*Kullar*, *supra*, at 168 Cal.App.4th at p. 133.)

Because " ' "so many imponderables enter into the evaluation of a settlement," ' " we review the trial court's approval of the class action settlement for clear abuse of discretion.  (*Carter*, *supra*, 224 Cal.App.4th at p. 819; see also *Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 234-235 (*Wershba*), disapproved on other grounds by *Hernandez*, *supra*, 4 Cal.5th at pp. 269-270.)  A trial court judgment is generally presumed to be correct; the burden is on appellant to demonstrate reversible error based on the record presented on appeal.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609 (*Jameson*).)  " 'In the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court.' "  (*Id*. at p. 609.)  We neither reweigh the relevant factors nor substitute our judgment for that of the trial court.  (*Wershba*, *supra*, 91 Cal.App.4th at pp. 244-245; *Kullar*, *supra*, 168 Cal.App.4th at pp. 127-128.)  Moreover, like the trial court, we " ' "need not and

13

should not reach any dispositive conclusions on the admittedly unsettled legal issue." ' "
(*7-Eleven*, *supra*, 85 Cal.App.4th at p. 1146.)

**B.      *The Trial Court's Exercise of Discretion***

Well before Isaacson's objection, the trial court signaled its concerns about the value to shareholders of the disclosure-only settlement.[9]  After requiring several iterations of supplemental briefing and evidence, however, the trial court independently satisfied itself that the settlement was fair to the class.  (See *Kullar*, *supra*, 168 Cal.App.4th at p. 129.)  At the heart of the trial court's analysis were its determinations that a monetary recovery was improbable; the merger and the negotiations leading up to it could not be unwound; Chang's insider trading was not reasonably discoverable before the tender offer closed; and the settlement provided "material value" to class members by compelling disclosure of the standstill agreement prohibiting Party B from increasing its offer during the standstill period, and "some value" to class members by compelling

_____

[9] In its first order requiring supplemental briefing, the trial court directed the parties to address *In re Trulia, Inc. Stockholder Litigation* (Del. Ch. 2016) 129 A.3d 884 (*Trulia*).  Remarking on "the proliferation of disclosure settlements," the Delaware Court of Chancery characterized these as "the most common method for quickly resolving stockholder lawsuits that are filed routinely in response to the announcement of virtually every transaction involving the acquisition of a public corporation."  (*Id.* at p. 887, fn. omitted.)  The corporation agreed to give stockholders "some additional information that theoretically would allow the stockholders to be better informed in exercising their franchise rights.  In exchange, plaintiffs dropped their motion to preliminarily enjoin the transaction and agreed to provide a release of claims on behalf of a proposed class."  (*Ibid.*)  And "[t]he only money that would change hands is the payment of a fee to plaintiffs' counsel."  (*Ibid.*)  The court noted "concerns" that such disclosure settlements "rarely yield genuine benefits for stockholders" who might lose  "potentially valuable claims that have not been investigated with rigor."  (*Ibid.*)  The trial court thus recognized its special responsibility to carefully evaluate disclosure settlements, consistent with its obligations under *Kullar*.  But the concerns noted in *Trulia* do not necessarily render a particular settlement unfair, any more than structural incentives for "professional objectors" to oppose a settlement to extract a fee render a particular objection unfounded. (See, generally, *Hernandez*, *supra*, 4 Cal.5th at pp. 272-273 [discussing policy concerns presented by "professional objectors"].)

14

Alliance's waiver of the prohibition.  We discern no abuse of discretion in its evaluation on either side of the *Kullar* balancing.

### 1.	*The Value of the Release of Class Claims*

Through its preliminary and final approval orders, the court focused on "challenges to achieving a financial recovery" and "the impossibility of rewriting the history of the negotiations leading up to Corning's offer."  The challenges contemplated by the court included (1) the likely application of the business judgment rule,[10] rather than enhanced scrutiny, to examine the directors' actions in connection with the merger; and (2) the likelihood that, even under enhanced scrutiny, case-specific facts supported the reasonableness of the transaction, making the chances of securing damages "slim": (a) the Board engaged an experienced, qualified, and unconflicted financial advisor to assist with the transaction; (b) Alliance's revenues and share price were declining, such that the transaction achieved shareholder value that could otherwise have taken several

---

[10] " 'The business judgment rule is a " ' "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." ' [Citation.] It 'posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be "attributed to any rational business purpose." ' [Citation.]"  (*Central Laborers' Pension Fund v. McAfee, Inc.* (2017) 17 Cal.App.5th 292, 314, quoting *Unocal Corp. v. Mesa Petroleum Co.* (Del. 1985) 493 A.2d 946, 954 & *Cede & Co. v. Technicolor, Inc.* (Del. 1993) 634 A.2d 345, 360, decision modified on reargument by *Cede & Co. v. Technicolor, Inc* (Del. 1994) 636 A.2d 956, 957.)  The directors' actions in connection with a merger or acquisition that will result in a change of control are typically subject to "enhanced scrutiny," an intermediate standard of review, in determining whether the directors have met their duty to shareholders. (*Omnicare, Inc. v. NCS Healthcare, Inc*. (Del. 2003) 818 A.2d 914, 928.)  But when the majority of shareholders accept a tender offer, the acceptance has a "cleansing effect"—unless the stockholders were "interested, coerced, or not fully informed"—by which "the business judgment rule irrebuttably applies." (*In re Volcano Corporation Stockholder Litigation* (Del. Ch. 2016) 143 A.3d 727, 747, 749-750.)

years to recover; and (c) after the tender offer and the standstill waiver were announced, clearing the way for any interested party to come forward with a superior offer, none did.

Accordingly, the trial court fulfilled its proper role in evaluating a range of potential risks and weaknesses in the plaintiffs' claims, rather than purporting to render a judgment based on a final determination of one potential weakness and disregard for the others. (See *Kullar*, *supra*, 168 Cal.App.4th at p. 130.) Although we cannot say with certainty which considerations the trial court deemed weightiest, it is incumbent on Isaacson, as the appellant, to affirmatively demonstrate an abuse of discretion. (See *Jameson*, *supra*, 5 Cal.5th at pp. 608-609.)

### 2. *The Value of the Settlement Consideration*

The trial court found that the standstill waiver and disclosure provided some material value to the class. The court did not precisely quantify the value of the standstill disclosure and waiver but determined that it was sufficient to justify the release considering the objectives of the litigation and the value of the release. The court acted within its discretion in determining that the standstill waiver and disclosure provided some material value to the class. Moreover, consistent with our conclusion that Isaacson has not shown that the court abused its discretion in assessing the strengths and weaknesses of the released claims, the court acted within its discretion in determining that this material value was sufficient to justify final approval.

As Isaacson concedes, the settlement consideration has some value. The trial court acted within its discretion in this case in determining, based on its independent analysis of the settlement approval record, that the standstill waiver had "some value" and the standstill disclosure had "material value."

A standstill waiver that permits a previously restrained party to submit a topping bid may benefit shareholders to the extent that it increases the likelihood that a topping bid will actually be submitted, such that an increased transaction price will be obtained. (See *Columbia Pipeline*, *supra*, 2019 WL 3778370, at pp. \*7, \*36; *In re Compellent*

16

*Technologies, Inc. Shareholder Litigation* (Del. Ch. Dec. 9, 2011) 2011 WL 6382523, \*19-\*20.)  Here, the trial court scrutinized the relevant contextual circumstances in determining that the standstill waiver in this case had "some value," and only "some value."

Similarly, disclosure settlements that cause the disclosure of material information, information that significantly alters the total mix of information made available, may provide a meaningful benefit to stockholders.  (*Trulia*, *supra*, 129 A.3d at p. 899.)  Here, the trial court independently evaluated the disclosures Bushansky obtained and determined that the disclosure of the standstill agreement pertaining to Party B was material, such that the disclosure of the same provided "material value" to shareholders.

Accordingly, the trial court fulfilled its obligations in independently evaluating the reasonableness of the settlement.  (See *Kullar*, *supra*, 168 Cal.App.4th at pp. 129-130.)  None of the challenges Isaacson raises indicates that the trial court abused its discretion in conducting the required analysis.  Rather, Isaacson suggests that we reweigh the factors on which the trial court relied, on the theory that it erred as a matter of law in assessing the significance of Chang's insider trading to both the value of the class claims and the value of the settlement disclosures.  Isaacson's arguments misapprehend our deferential review and misconstrue the trial court's order.

## C.    *Chang's Insider Trading*

Isaacson's fundamental contention is that Chang's undisclosed insider trading compelled rejection of the settlement because of its impact on both sides of the *Kullar* balancing.  Isaacson's arguments all begin with a common premise—that the trial court was required to treat Chang's insider trading as material to shareholders evaluating Corning's tender offer.  According to Isaacson, the failure to disclose Chang's insider trading increased the value of the plaintiffs' actual or potential claims, in that the omission of information material to shareholders evaluating the offer would disentitle the board of directors from deference to its business judgment and potentially gave rise to

17

other claims.  Isaacson further considers Alliance's failure to disclose Chang's insider trading to render meaningless its disclosure and waiver of its standstill agreement with Party B, because shareholders were not "fully informed."  But because Isaacson does not demonstrate that Chang's undisclosed insider trading necessarily altered the balance of relevant factors before the trial court, he demonstrates no abuse of discretion on this record.  (See *Jameson*, *supra*, 5 Cal.5th at pp. 608-609.)

### 1.	*Materiality to the Value of the Released Claims*

Bushansky's core claims were that Alliance's former directors breached their fiduciary duties the shareholders in connection with the Corning transaction, including breach of their duty of candor.  Isaacson contends that the post-settlement revelation of Chang's insider trading strengthened these claims.  Isaacson reasons that Chang's insider trading would have been material to a stockholder deciding whether to tender, such that (1) Chang's nondisclosure gave rise to a distinct direct theory for breach of the duty of candor; and (2) Chang's nondisclosure meant that the merger transaction would not be scrutinized using the business judgment rule, but under enhanced scrutiny.  Isaacson contends that the court erred in approving the settlement because it did not appreciate these implications.  To the contrary, we are not persuaded that the revelation of Chang's insider trading required the trial court to alter its discretionary determination that none of the released claims were likely to yield damages, such that the best result Bushansky could achieve through this action were the disclosures reasonably obtainable before the tender offer closed.

As a threshold matter, trial courts in their fairness inquiry do not decide contested issues as to the merits of the class action.  (See *Kullar*, *supra*, 168 Cal.App.4th at pp. 129-130; *7-Eleven*, *supra*, 85 Cal.App.4th at p. 1146.)  Rather, trial courts consider the range of potential outcomes on such issues in the course of the broader fairness analysis.  (See *Kullar*, *supra*, 168 Cal.App.4th at pp. 129-130; *7-Eleven*, *supra*, 85 Cal.App.4th at p. 1146.)  Accordingly, the proper course was for the trial court to

consider the impact of Chang's insider trading had on the range of potential litigation outcomes, without deciding ultimate issues of fact or law, such as whether Chang's insider trading was material to evaluating the merger. The trial court considered Isaacson's objection and determined that the objection did not "materially impact" its analysis of the settlement. We understand this to mean that the court considered the insider trading in its evaluation of the settlement and determined that the associated potential did not warrant rejecting the settlement.[11] We discern no abuse of discretion in this determination.

Isaacson has not shown that Chang's insider trading would necessarily be material to shareholders evaluating Corning's tender offer, such that the trial court was required to treat the insider trading as material to shareholders in conducting its analysis. Materiality is measured by the function to be served or the harm to be avoided. Chang's insider trading was, of course, material to his fitness as a fiduciary, to his disclosure obligations to the Securities and Exchange Commission, to the investing public with whom he surreptitiously traded his own shares to his personal profit, based on insider information. (See *United States v. O'Hagan* (1997) 521 U.S. 642,659 [noting the "inhibiting impact on market participation of trading on misappropriated information"]; *United States v. Goffer* (2d Cir. 2013) 721 F.3d 113, 132 [insider trading defendant's "corrosive influence on the integrity of the financial markets and on the expectation of trust and confidence"]; see also 15 U.S.C. §§ 78c(15), 78p.) But Isaacson has identified no authority that would compel his conclusion that Chang's insider trading as Alliance sought to be acquired is material to shareholders deciding whether to accept Corning's share price.

---

[11] We do not adopt Isaacson's characterization of the order as conclusively determining that Chang's insider trading was not material, or that the former Alliance directors would therefore have been entitled to application of the business judgment rule: this was not the trial court's role. (*7-Eleven*, *supra*, 85 Cal.App.4th at p. 1146.)

19

On appeal, Isaacson cites *Morrison v. Berry* (Del. 2018) 191 A.3d 268 (*Morrison*). In *Morrison*, the Delaware Supreme Court explained that " '[a]n omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote.' Framed differently, an omitted fact is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " (*Id.* at pp. 282-283, fns. omitted.) *Morrison*, however, involved the failure to disclose a founding shareholder's request that the company be sold to one particular private equity buyer, his warning that he would sell his shares if the company was not sold " ' "at this time," ' " and his rationale for both: the Delaware Supreme Court held that reasonable shareholders would consider the information important in deciding whether to tender their shares or seek appraisal. (*Id*. at pp. 286-287.)

After appellate briefing closed, Isaacson directed our attention to *Goldstein v. Denner* (Del. Ch. May 26, 2022) 2022 WL 1671006 (*Goldstein I*), where the Delaware Court of Chancery found that the specific character of one director's insider trading in connection with a tender offer and another director's abetting of those machinations rendered the transaction subject to enhanced scrutiny. In *Goldstein I*, Sanofi S.A. approached two of the company's directors, Denner and Posner, with an interest in buying the company for around $90 per share, more than $30 dollars per share above the price at which it was then trading. (*Id*. at p. *1.) The two directors delayed reporting to the rest of the board Sanofi's initial overture. In the interim, Denner caused a hedge fund he controlled to octuple its holdings of the company's stock, in violation of the company's insider trading policy. (*Ibid*.) Denner and Posner then stalled Sanofi, including by failing to report Sanofi's repeated overtures, until nearly six months had passed from the hedge fund's purchase of company stock to skirt "[s]ection 16(b) of the Securities Exchange Act of 1934, which requires that an insider disgorge short-swing profits from any sale that takes place less than six months after the purchase." (*Ibid*.)

20

After the necessary time had elapsed, and "[w]ithout authorization from the Board, Denner invited Sanofi to make a preemptive bid that could result in a single-bidder process." (*Id.* at \*35.) Denner accelerated the Sanofi transaction to consummation at a transaction price nearly a third below the company's internal valuation of $150 per share under its long-range plan, when "[n]othing about the Company's trajectory warranted Denner's volte face" and in fact "the Company's standalone prospects had continued to improve." (*Id*. at \*1, \*35) The Court of Chancery found that this insider trading was an undisclosed material fact, because Denner "played a central role in the Transaction" and the insider trading at issue "shed[] light on [his] financial interests and motivations" in negotiating the timing and terms of the deal. (*Id*. at pp. \*23-\*24, \*30.)

Here, however, it is not obvious what information shareholders would glean from Chang's insider trading or how that information would in turn be material to their consideration of the tender offer. As alleged in the criminal complaint, Chang sold shares when he had advance knowledge of information that would soon lower the share price, and bought shares when he had advance knowledge of information that would soon raise the share price. Isaacson has not established that it was unreasonable for the trial court to anticipate that Chang's insider trading might be construed differently than the information in *Morrison* and *Goldstein I*—i.e., not as information going to the objective merits of selling the company or conflicts of interest in the negotiation process, but merely as information that one shareholder had leveraged the delay between negotiation of a tender offer and the eventual public disclosure that would predictably increase the share price. Accordingly, we are unable to fault the trial court to the extent, in addressing settlement approval, it considered it at least uncertain whether Chang's insider trading would have been material to reasonable shareholders evaluating the tender offer.

For the first time on appeal, Isaacson offers a single conclusory argument that shareholders would have considered material "Chang's decision to sell [3,000 of 300,000 shares] when it looked like Corning might walk away, rather than hold out for an

offer from Party B," because it would have suggested that Chang considered a topping bid unlikely. In deciding whether this one transaction would be material to shareholders considering the Corning tender, however, the trial court was entitled to consider not just the fact and timing of Chang's trades but also the low volume of the transaction in comparison to the total holdings Chang had amassed in anticipation of sale. Although the trial court did not expressly analyze the asserted materiality of Chang's insider trading in its written opinion, we do not believe this fact has special significance; Isaacson never articulated a specific argument for the trial court to address.[12] We understand the trial court to reasonably have considered it possible that Chang's insider trading, in a trial of plaintiffs' claims, would be deemed immaterial to shareholders in deciding whether to tender their shares. (See *Kullar*, *supra*, 168 Cal.App.4th at pp. 129-130; *7-Eleven*, *supra*, 85 Cal.App.4th at p. 1146; *Morrison*, *supra*, 191 A.3d at pp. 282-283, 286-287.) Because the trial court was not required to treat Chang's insider trading as material to shareholders evaluating the merger, we reject Isaacson's contention that the trial court committed legal error by not doing so.

Although Isaacson's appellate briefing drew attention to Chang's insider trading, it did not reach the central issue presented by his appeal—whether the trial court's evaluation of the value of the released claims in comparison to the benefits secured through settlement constituted an abuse of discretion. We are reviewing a trial court's "ballpark" determination that a monetary recovery was improbable based on a combination of several considerations. Isaacson has not demonstrated that the trial court's conclusion was wrong on the record then before it. Assuming that breach of

---

[12] In his written objection, Isaacson presumed that Chang's insider trading was undisclosed material information and argued that it would prevent Defendants from invoking the business judgment rule. Isaacson did not explain the basis for his presumption that Chang's insider trading would be material to consideration of Corning's tender offer.

fiduciary duty claims relating to the merger would be subject to enhanced scrutiny because Chang's undisclosed insider trading would have been material to shareholders (see *Goldstein I*, *supra*, 2022 WL 1671006, at pp. *23-*24, *30), Isaacson did not identify a theory by which, in this case, those claims would probably lead to monetary damages relating to the merger.[13]  At most, Isaacson argues that, as a general matter of litigation tactics, Bushansky might have been able to extract a better settlement had he pushed defendants to test his claims—and those theories identified by Isaacson—and survived a motion to dismiss.  But it is the potential strength or weakness of the released claims on their merits—not the marginal gains attributable to litigation tactics—that the trial court had to gauge.  It is Isaacson's burden to demonstrate that the trial court abused its discretion, including by developing a reasoned argument supported by legal authority in support of his position.  (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 565; *Lee v. Kim* (2019) 41 Cal.App.5th 705, 721; see also *Jameson*, *supra,* 5 Cal.5th at p. 609.)  Isaacson has not satisfied his burden.

Again for the first time on appeal, Isaacson argued that, as a result of Chang's insider trading, stockholders could have a direct claim against Corning for unjust enrichment because Corning secured what Isaacson characterizes as "an award of $792,141.50 from Chang's breaches of duty to [Alliance] stockholders."  Isaacson forfeited his argument that shareholders had a valuable claim for unjust enrichment against Corning as a result of Chang's insider trading, because the parties had no opportunity to contest it and the trial court had no opportunity to consider it in evaluating the settlement.  (See *Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 (*Quiles*); see

---

[13] In *Goldstein I*, the plaintiff offered a concrete theory of damages.  The damages were the difference between the company's internal valuation of its future share price, about $150 per share, and the actual sale price.  (*Goldstein I*, *supra*, 2022 WL 1671006, at p. *56.)

23

also *In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 510.)[14]  Even if

not forfeited, Isaacson's theory of liability is unsupported by the record before the trial

court.  The criminal judgment required Chang to pay $782,141.50 to Corning in

"restitution."  Nothing in the record before the trial court disclosed the basis for the award

of restitution, let alone that the restitution to Corning was compensation for injuries

suffered by Alliance's shareholders.  Accordingly, Isaacson's contention that Corning

received a windfall as a result of the restitution award is without support.  Isaacson has

not shown that the trial court had any reason to treat the potential claim as likely to

generate monetary value in its settlement approval analysis, much less that the trial court

abused its discretion by failing to do so.

In the trial court, Isaacson argued only that Chang was subject to a derivative

claim for misuse of confidential corporate information by a fiduciary, and conceded that,

because it was a derivative claim, it was "likely" extinguished by the merger.  Faced with

this argument, the trial court unsurprisingly wrote that Isaacson "appear[ed] to agree with

plaintiffs that any claims arising from Chang's insider trading were derivative claims

extinguished by the merger."

After the close of briefing, however, Isaacson directed our attention to *Goldstein v.

Denner* (Del. Ch. June 2, 2022) 2022 WL 1797224 (*Goldstein II*).  There, following a

line of authority flowing from *Parnes v. Bally Entertainment Corp.* (Del. 1999) 722 A.2d

---

[14] Defendants request judicial notice under Evidence Code section 459 of the superseding information and a sentencing memorandum in Chang's federal criminal proceeding, to establish that the order for restitution was to reimburse Corning for expenses Corning incurred complying with the criminal investigation, rather than for Chang's breaches of fiduciary duty vis-à-vis Alliance shareholders.  We deny the request to judicially notice matters not before the trial court, given the absence of exceptional circumstances warranting such a measure.  (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.)  Moreover, we further observe that judicial notice does not extend to the truth of hearsay statements within judicially noticeable documents.  (See *In re Vicks* (2013) 56 Cal.4th 274, 314.)

24

1243, the Delaware Court of Chancery ruled that a shareholder had standing to raise a derivative claim for disgorgement of the profits a director obtained through insider trading in connection with a tender offer, on the ground that the insider trading could have tainted the sale process. (See *Goldstein II*, 2022 WL 1797224, at pp. *4, *10-*12.) A plaintiff shareholder who has pled a viable underlying derivative claim, the value of which is material in the context of the merger, may "challenge[] a merger based on a board's alleged failure to obtain value for an underlying derivative claim that existed prior to and independent from the merger." (*Id.* at p. *10.) Moreover, a shareholder may also "assert a direct claim challenging a merger if the facts giving rise to what otherwise would constitute a derivative claim led *either* to the price *or* the process being unfair." (*Id*. at p. *11.) A plaintiff who thus directly attacks the fairness or validity of a merger is not alleging an injury to the corporation but to its shareholders " 'and may pursue such a claim even after the merger at issue has been consummated.' [Citation.]" (*Id.* at p. *10.) Accordingly, at oral argument, Isaacson contended that *Goldstein II* supports the theory that shareholders here retained a valuable claim for disgorgement of the profits obtained through insider trading against Chang even after the consummation of the merger.

Because this argument was not before the trial court, however, it would be inappropriate for us to consider it in our deferential review for abuse of discretion. In the trial court, Isaacson obliquely conceded that any derivative claims arising out of Chang's insider trading were "likely" released, and he identified no direct claims. Even as recently as his appellate reply brief, Isaacson stopped short of taking the position that shareholders could pursue a post-merger disgorgement claim, asserting instead that the record was "too sparse"—given plaintiffs' failure to investigate—to assess whether the value of a disgorgement claim was material in the context of the merger.[15] If Isaacson

---

[15] In *Morris v. Spectra Energy Partners (DE) GP, LP* (Del. 2021) 246 A.3d 121, 136 (*Morris*), the court explained that "a $10 million derivative claim could not

25

believed that the record before the trial court did not support approval of the settlement because Bushansky, post-merger, may have been able to pursue directly what otherwise would have been a derivative claim for insider trading, Isaacson needed to make, and could have made, that point in the trial court. (See *Quiles*, *supra*, 28 Cal.App.5th at p. 1013.) In reviewing for abuse of discretion, however, we cannot expect the trial court to expressly address a claim Isaacson himself only articulated for the first time at oral argument on appeal.

Isaacson did surmise in the trial court that Bushansky "may well have missed other issues" if he "missed Chang's insider trading" due to an inadequate investigation. But as the trial court noted, the failure of any entity other than the plaintiffs involved in these proceedings to raise any claim in the three years since the merger made unlikely the existence of potentially valuable claims other than those considered in the litigation to that point.[16] None of Isaacson's arguments to the trial court pointed to the disgorgement theory Isaacson articulated at oral argument, the materiality of that claim in the context of

---

reasonably be expected to be material to a $1 billion merger value. The same derivative claim would be material to a $20 million merger." Here, the transaction price was about $305 million. Consistent with *Morris*, if the insider trading claim against Chang were valued at less than one percent of this sum, a trial court might legitimately assess as low the likelihood of the claim being deemed material to the transaction price. Isaacson has not argued that the disgorgement claim could be so valuable as to be material to the transaction price in this case. We note that the criminal complaint alleges that Chang profited in an amount exceeding $800,000 by trading on his insider knowledge of the anticipated merger and avoided losses of $980,000 by trading on his insider knowledge of Alliance's anticipated earnings reports.

[16] Addressing the contention that Bushansky's investigation may have missed meaningful claims, the trial court wrote that it was "not persuaded that plaintiffs' investigation failed to uncover potentially viable claims related to the merger or that any such claims exist now." We understand the reference to "viable" claims in the context of the court's order and the court's limited role at final approval. (See *Kullar*, *supra*, 168 Cal.App.4th at p. 133.) That is, we understand the reference to "viable" claims to mean claims that had a probability, through continued litigation, of generating a monetary recovery.

the merger, or its effect on the fairness of the merger price or process. (See *Goldstein II*, *supra*, 2022 WL 1797224, at pp. *10-11.) In his appellate briefing, Isaacson argued there must be some other remedy available to shareholders, even if he was unable to identify it. For support, Isaacson cited only the general proposition that " 'equity will not suffer a wrong without a remedy.' " (*Shawe v. Elting* (Del. 2017) 157 A.3d 152, 159, fn. omitted.) Isaacson has identified no principled basis by which we should now explore the potential for distinct equitable claims that had no meaningful exposition in the trial court and have been raised only in passing on appeal. Chang's criminal conviction and sentence tend to undermine Isaacson's suggestion that this particular wrong has gone unremedied, and Isaacson has not articulated a theory by which Alliance shareholders could probably have achieved a monetary recovery in the civil action.

## 2. *Materiality to the Settlement Consideration*

Isaacson contends that the trial court incorrectly determined that shareholders were "fully informed" at the time of the tender, when in fact shareholders were unaware of Chang's insider trading. This line of argument is undermined by our determination above that the trial court was entitled to consider the potential risk that Chang's insider trading might not be found to be material to consideration of the tender offer. It also misconstrues the trial court's order. The subsequent revelation of Chang's insider trading, which the trial court determined could not have been reasonably uncovered before the tender offer closed, did not render the consideration Bushansky obtained during the tender offer period worthless.

Initially, we reject Isaacson's unsupported contention that a disclosure settlement may only provide a benefit to the class if a court determines that the result of the disclosures is that the shareholders were fully informed—meaning, at least, that no piece of material information was omitted from the disclosures. While the goal of a plaintiff negotiating a disclosure settlement is undoubtedly to ensure that all material information is disclosed, settlements are not required to be perfect as a condition of approval. Rather,

27

they are required to be fair. (See *Clark v. American Residential Services LLC* (2009) 175 Cal.App.4th 785, 799, 803 (*Clark*) [" 'the operative word is "settlement" ' "]; *Kullar*, *supra*, 168 Cal.App.4th at pp. 129-130, 133.) We acknowledge the possibility that errors may reduce the value of the disclosures that are obtained and may increase the value of the release. But trial courts are well equipped to weigh the benefits of any disclosures secured through a settlement in light of all of the circumstances. (See *Dunk*, 48 Cal.App.4th at p. 1801 [trial court's determination is an " ' "amalgam of delicate balancing, gross approximations, and rough justice" ' "].) Indeed, that is precisely how the Delaware Court of Chancery analyzed materiality in *Trulia*. (*Trulia*, *supra*, 129 A.3d at pp. 899-907.)

We further reject Isaacson's contention that the trial court's determination that the settlement consideration was sufficient to justify the release of claims rested on the premise that the shareholders were, in hindsight, fully informed. In making this argument, Isaacson selectively excerpts from the trial court's analysis of preliminary approval—prior to learning of Chang's insider trading—and Bushansky's request for attorney's fees.

At preliminary approval, the court reasoned that the likely impediments to monetary recovery meant that "ensuring that the shareholder vote on the merger was fully informed was probably the most important outcome this action could achieve." Thus, the limited non-monetary consideration provided by the settlement was, in context, a fair return for the released claims.

At final approval, the court "st[ood] by" that analysis, explaining that although the value of the standstill waiver and disclosure was less than what Bushansky contended, their value was sufficient to support the settlement. That a "fully informed" shareholder decision was the most important potential benefit to be gained by litigation of the class action does not demonstrate that the trial court must therefore have deemed settlement to have met that objective. Rather, it reflects that the settlement sufficiently furthered that

28

objective, to the extent practicable in context, so as to render the settlement consideration a fair exchange for the release of claims. Thus, the final approval order rests on the determination that the standstill disclosure had material value, the standstill waiver had some value, and the release did not sacrifice any claims that were likely to yield anything other than disclosures—which could only assist the class in the time before the tender offer closed. The final approval ruling does not rest on any express, necessary, or implicit ultimate determination that the shareholder vote was fully informed or that Chang's insider trading was immaterial to shareholders evaluating the tender offer.

In granting Bushansky's request for fees, the court determined that "an award under the substantial benefit doctrine [was] appropriate." The court reasoned that the "standstill waiver and associated disclosure prevented the merger from proceeding based on an uninformed shareholder vote, protecting an essential shareholder right." Reasoning that a shareholder vote is either "fully informed" or "uninformed," Isaacson asserts that the trial court decided that Chang's insider trading was not a material fact that needed to be disclosed to shareholders. We reject the binary strictures of his premise and his interpretation of the trial court's fee award.

In reply, Isaacson contends that the standstill waiver and disclosure did not provide sufficient value to support the settlement. As to the standstill waiver, Isaacson offers only a superficial argument to the effect that one standstill waiver is categorically insufficient to justify a settlement, even if two standstill waivers may be. But there was only one standstill agreement to waive, and the trial court duly considered that there was only one waiver in assessing the value to the class. As to disclosure of the standstill agreement, Isaacson does not contend that it had no value, only that its value was insufficient relative to the release of the claims in this case. Isaacson's invitation to reweigh factors legitimately considered by the trial court exceeds the scope of our deferential review. (*Wershba*, *supra*, 91 Cal.App.4th at pp. 244-245; *Kullar*, *supra*, 168 Cal.App.4th at pp. 127-128.)

29

At bottom, the trial court concluded that the value produced by the settlement, though limited, was sufficient to support the settlement because the consideration constituted a fair exchange for the release of claims in all of the circumstances. Isaacson has not shown that the trial court abused its discretion in making that determination.

## III.   DISPOSITION

The judgments are affirmed.

_____
LIE, J.

WE CONCUR:


_____
GREENWOOD, P.J.



_____
GROVER, J.




*Bushansky v. Alliance Fiber Optic Products*
H047100
*Khaki v. Alliance Fiber Optic Products*
H047101